Good morning, Your Honors. Vitalik Kurchin representing Mr. James Emmett, the appellant in this case. May it please the Court, we're here because in July of 2011, Tacoma City Police Officers Bain and Nettleton used excessive intermediate force against Mr. Emmett and they're not entitled to qualified immunity. On that day, Mr. Emmett was parked in his car and Officer Bain saw him, activated his lights, Mr. Emmett pulled over to the side of the road, Officer Bain approached, they started having a conversation about Mr. Emmett not having his driver's license on him and then Mr. Emmett made a flippant remark about something like, just shoot me. That got Mr. Officer Bain's spidey sense tingling a little bit. He had Mr. Emmett leave, exit the vehicle. He had him turn around and put his hands on top of the roof and then he patted him down for weapons and basically a Terry Frisk and he found a canister with a little bit of marijuana in it. At that point, Officer Nettleton had arrived on scene and Officer Bain and Nettleton then had a conversation away from Mr. Emmett who had continued to face his truck with his hands on top of the roof. After that conversation, Officer Bain came back over to Mr. Emmett. He had attempted to grab, I believe, his left wrist in order to put him under arrest for simple misdemeanor marijuana possession under 40 grams, which at that time still was unlawful under state law. At that point, Mr. Emmett broke free of the officer's grasp, said no, turned around so that he's facing the officers and then at this point, he either put his hands up into the air or he put them on the back of his head and interlocked them. That part is a little bit unclear or there's contradicting testimony, but I don't think it's material. In either case, he essentially just stood, turned around, stood, faced the officers and then had his hands up. But he did resist the officer's attempt to cuff him. Yes, we're not saying there was no resistance. We're saying there wasn't active enough to meet the gram elements. Particularly, this court has repeatedly stated that if the resistance is not particularly bellicose, that it does not meet the second or third prong of the gram factors. And additionally, this court has also stated numerous times that resistance runs the gamut and it's not just gray or black and white. And so our argument here is that there was a little bit of resistance. It was not to the point that justifies the use of a taser in dart mode. And I also want to emphasize that the standard of review in this case is particularly important. This court has repeatedly stated that in 1983 excessive force cases that summary judgment should be granted sparingly. And this, of course, is an appeal from a grant of summary judgment. And additionally, all justifiable inferences are to be drawn in the appellant's favor. So did Bain then immediately back away? Is that what happened? Both officers, yes. So he grabbed his wrist and then he pulled it back. He broke free of Officer Bain's grasp, turned around, put his hands up and just stared at the officer. What happened to the officer? The officer stood 10 to 12 feet away from. He backed up, in other words. I don't think specifically there's anything. How could he have been 10 feet away when he twisted his arm? He approached. So, yes, the assumption is that he obviously backed away. He had to back away, right? What's that? He had to back away. Is that correct? Again, I don't think, I suppose, yes. Well, how did he get 10 feet away at the time? Walking, I imagine. When he was holding the wrist of your client, he couldn't have been 10 feet away. No, no, absolutely. So one of them must have backed away. He grabs his wrist. My client breaks free of that grasp. My client turns around. And at that point, I assume the only thing that says in the record that they were 10 to 12 feet away when they tased my client. OK, but how they got there, I don't know. But I imagine they just walked back. It was Nettleton or Nettleson who shot the first dart, is that right? That's correct. And then Bain shot the second one. That's correct. So let me ask a question, if I may, that will let you know the part of this case that gives me concern about Appellant's position. And that's this. OK, Appellant broke away from the attempted handcuffing. Then, as I understand it, Appellant also declined or refused to lay down when given instructions to do that, to get on the ground. And then also, Appellant was a big guy, let's say a lot bigger than the officers. So if we say that officers can't tase in that context, after giving a warning, comply or you'll be tased, then are we going to encourage more violent conflicts that then might have to be answered by deadly force? I don't think we're inviting more deadly conflict, because I think the officers would, if they're not escalating the situation many times, they may be able to de-escalate it. So if anything, this might be a good thing to rule in Mr. Emmett's favor in terms of the rest of the Ninth Circuit and the kind of message it sends. Because we don't, I think that, well, regarding Mr. Emmett's size, he's actually about my size and height. And he's got probably about 50 pounds less, weighs about less than I do. But he's a bit more muscular than I am. But you've got to remember, there are two officers who are both trained, who both have pepper spray, who both have batons, and who both obviously have tasers and guns. You look to me to be about 6'4", 6'5". I'm sorry? You look to me to be about 6'4". About 6'6". 6'6"? Yes. And your client is about the same height? Yes. And he's more muscular? He is leaner. I don't know if he's necessarily more muscular. OK. I've got a bit more jelly on me. Your whole argument turns on that Bryant shows that the law is clearly established. But as you just articulated the facts, the facts are a little bit different. The facts are a little bit different, but I don't think they're different. I mean, we're never going to have identical facts. And in fact, the Supreme Court in January on White v. Polly stated, still reiterated, that there doesn't need to be a particular case directly on point. But I think Bryant is as close as we're going to get. And Bryant, we have an individual who is standing. He's irate. He's pounding on his chest. And he's in his boxers. He's shirtless. And he's screaming vulgarities. And the officer there tased him. And the only reason the officer, quote unquote, got off in that case is because at that point, there was no established precedent that a taser in dart mode constitutes intermediate use of force. Well, that happened. That case was decided in November 2010. What we have here is July 2011. It's about seven, eight months there where the officers have time to know that a taser in this situation does constitute intermediate use of force. But they definitely know by then, or should know, that use of the taser is an intermediate level of force that requires substantial justification. But I guess I have a question. I'm assuming they need to know that. But then what makes it unreasonable? Is there any case that's ever held that it's unreasonable to deploy a taser under circumstances where somebody breaks off and won't let themselves be handcuffed and then refuses to comply with officer requests? And then furthermore, is warrant specifically? If you don't comply, you'll be tased. There is no case specifically with all of those factors. But I would point to a couple of cases that existed at the time of July 2011 that should have put the officers on notice that intermediate use of force could not be used in this particular context. Now, one is obviously the Graham factors, which are severity of crime, in this case, a simple misdemeanor. Immediate threat. He was not an immediate threat. He wasn't trying to leave. He wasn't trying to flee. He wasn't trying to fight. He wasn't trying to argue. He wasn't verbal. He wasn't physical. He wasn't anything. He was just standing there. And active resistance, again, there was a resistance for positions that it was passive at best. It was not particularly bellicose, certainly didn't rise to the level of being enough. And if we look at analogous case law, which is our Supreme Court seems to prefer nowadays, there is obviously the Bryan v. McPherson case, which I think is the most apposite. Then there's Smith v. Sidney Hemet. That's where officers responded to a domestic violence call where the individual was standing on the porch with his hands in his pockets. And they told him repeatedly, do not, you know, let me see your hands. Let me see your hands. He actually turned left, went back into the house, came back out, still had his hands in his pockets. The officers kept saying, you know, I need to see your hands. They eventually had to tackle him. There were like four officers tackled him. A dog came in to bite him. And the court still held under those circumstances that there was a fourth amendment violation. There's also Young v. L.A. County, where the individual was sitting on the curb, simply arguing. And that was pepper sprayed. Then there's Matos v. Aguirreno. More specifically, your honors, I'm out of time. May I just finish my last thought? Yes, you have the extra time you need. Go ahead. Thank you. So there's Matos v. Aguirreno, or more specifically, Berks v. City of Seattle, which is a subset of that case, where the individual there was clutching the steering wheel and actively trying to be stopped from being removed from the car. And the court still held there was a fourth amendment violation. And then finally, just on Friday, S.B. v. County of San Diego County was decided by this court. And there, the officer shot an individual who was on his knees in his kitchen who had knives in his pockets. And the deceased actually reached for a knife and was shot at that exact moment. And this court still held that that was a fourth amendment violation. So what we have here are a series of cases with even more serious facts than Mr. Emmett ever did, just standing there, where there was a fourth amendment violation. And some of these cases were already in existence in July 2011. And so that puts them on notice that they can't use intermediate force in this particular context. And additionally, the question of whether or not a taser constitutes intermediate use of force is also decided in November 2010 by Brian M. McPherson. So we'd ask the court to reverse and remand. Thank you. Thank you, counsel. Okay. Then for the penalty, City of Tacoma, we have Jean Homan. Yes. Good morning, Your Honors. May it please the court. Jean Homan on behalf of the City of Tacoma and the officers. As the court has noted, this wasn't a simple situation of a suspect simply not complying with an officer's commands. Taking the totality of the circumstances as the court must in evaluating the officer's application of force, we start with a suspect who or an individual at the first contact who's acting very unusual. He's parked after midnight in the middle of a major arterial with no obstruction in the roadway. When he pulls over and the officer contacts him, he won't make eye contact with the officer. He won't hand the officer his driver's license. He hands him a note with his name and number on it and permission from his doctor not to wear a seat belt. The officer points out to him he needs to have a driver's license. And his response, which they characterize as just a flippant comment, was you should just shoot me then. It would make it easier. There are attempts to minimize the significance of that comment. On that point, Officer Nettleton, the backup guy who came is the first to deploy a taser here. And did he hear that comment? He was not present for that comment, and that would not go to his analysis. But it certainly went to Bain's subsequent application of the taser. But when officers... To restate that again, so what did that tell? What did all that little scenario that you just went through? Certainly what that did, it created officer safety concerns. A lot of people don't like that. A lot of people get upset when they are confronted by a police officer. I get they get nervous. I even get, you know, last time I was stopped for a speeding ticket, which was years ago, I get real nervous. Well, Your Honor, I represent him, and I still get nervous. So I do appreciate that. But from the officer's perspective, he's conducting a community caretaking type function. He's contacting a driver who's stopped in the middle of an arterial intersection. The driver's response is not normal. And in fact, when he makes a comment, you should just shoot me, the officer's safety concerns were heightened. And Mr. Emmett himself, who has a background in law enforcement, both as a military police officer and as a corrections officer. Did the officer engage him at all at that point? You know, like, I'm not here to cause you any grief. Yes. You know, I'm just here to find out what's happened here. I'm concerned about your safety, other safety. The engagement in that kind of dialogue? What the officer said was, I'm not going to hurt you. There's no reason to hurt you. I'm not going to shoot you. But he did ask him to step from the vehicle so he could pat him down for weapons, because at that point, the situation appears less than normal. And Mr. Emmett's size is an issue. Officer Bain and Officer Nettleton are both about 5'10". Mr. Emmett is 6'5", 6'6", and outweighs the officers by 50 pounds. So the fact that there are two police officers there doesn't necessarily mean that Mr. Emmett's size and demeanor does not present a potential problem to the officers. He gets out of the car and they pat and Bain pats him down and doesn't find anything, any weapons. What he finds is an object that might be a weapon. He removes it from Mr. and he doesn't complete the pat down. And that's also important because he'd gotten as far as the left pocket, finds the cylinder, believes it could be a weapon, removes it, discovers it's marijuana. He hasn't patted down the right pocket. And Officer Bain testified that his intent was to get Mr. Emmett into custody and then complete the search and incident to arrest as opposed to a pat down. When he told Mr. Emmett he was under arrest and placed his hand on Mr. Emmett's hand and began to pull his hand behind his back, Mr. Emmett shouted no, broke the officer's grip. At that point, the officers did instinctively take a step back because you have a very large subject who's behaving abnormally, who's made comments about shooting him, and it was now physically resisting the officer's attempts to take him into custody. They cited him with the taser. And so the officers did consider and employ less intrusive alternatives before deploying the taser. They went with physical or verbal commands. They cited Mr. Emmett with the taser, which places a red dot on his chest. And then the officers testified. Oftentimes, that's enough to gain compliance. When the subject realizes he's being cited with the taser, they gave him multiple commands to get on the ground. He did not comply with the officer's commands. And they told him expressly that he would be tased if he did not get on the ground. At that point, Officer Nettleton deployed his taser. Mr. Emmett reacted by ripping the taser probes out of his chest. It hurt. Well, it does. But the thing that's so surprising is when deployed in a dart stun mode using the darts, it usually interferes with muscular control. Neither officer had ever seen a subject pull the taser darts from the chest. Officer Bain thought perhaps the darts had not made a proper connection. He deployed his taser. Mr. Emmett pulled them out again. At this point, Mr. Emmett started moving towards the back of the truck. The officers haven't finished searching him. And they haven't searched the truck for weapons. And he is ignoring their orders. With respect to the qualified immunity, the district court's determination that the deployment of the tasers was appropriate and reasonable under these circumstances should be affirmed. With respect to qualified immunity, the only case law that existed in July of 2011 at the time of this incident was Bryan, Brooks, and Matos 1 in the Ninth Circuit regarding the application of the taser. This case is different from Bryan. Bryan did not involve a subject that the officers had attempted to place under arrest, a subject who had deliberately broken free of the officer's grafts in an attempt. They told Bryan to remain in the car and not get out. They did tell him to remain in the car and not get out. Got out. He did get out. But they were not actively trying to take him into custody at the time. There was no physical interaction between Mr. Bryan and the officers before they deployed his taser. That's very different from the circumstances in this case. In Brooks and— Bryan was very agitated. Bryan was very agitated. Mr. Emmett's breaking free of the officer's grafts, expressly telling the officers no when they attempted to take him into custody put him into a different circumstance than the plaintiff and Bryan. Then you have Matos 1, where the victim of a DV called is tased in dart stun mode, which, as the court has acknowledged, is an intermediate level of force for simply raising her arm when the officers are going to take. The court found in Matos 1 that was an appropriate application of force. In Brooks, you have a pregnant subject who is refusing to exit her car, refusing to sign the traffic ticket. At this point, the taser was used in a drive stun mode as opposed to the dart mode. And the court found that was an appropriate application of force. It wasn't until several months after the incident here, which occurred in July of 2011, that the Ninth Circuit issued Matos 2, which took a different tact, which reversed the finding as to Matos 1 in Brooks and those being reasonable applications of force, but still found that the law was not sufficiently established under the facts in those cases at the time of those incidents to deprive the officers of their qualified immunity. With respect to plaintiff citation to Young v. City of Los Angeles, that was the case where in the Ninth Circuit held that an application of OC and as an intermediate level of force, that too postdates our incident. The district court correctly determined that the initial application of the taser was not an unreasonable application of force. And with respect to the qualified immunity, the court said, while the use, because we did take plaintiff's facts for purposes of this motion and for the purposes of appeal. And so plaintiff says, I did not attempt to assault the officers when they grabbed my arms to get me into custody. My arms were in a position of static resistance. So we accepted those facts for purposes of the motion for summary judgment. The district court said arguably under those facts, perhaps the application of the OC spray and the baton strikes would be excessive. But those are also intermediate levels of force. And there's no case law that was decided prior to July of 2011 that told the officers if you can use one level of intermediate or one type of intermediate force, if that's justified, you can't use a different type of intermediate force. The district court's grant of summary judgment should be affirmed. I'd be happy to entertain any questions. I have no questions. Thank you. Thank you, counsel. Now you used up all your time, but we'll give you a minute of rebuttal if you want it. Your honors, it's simply inaccurate to say that there was only one or not enough cases in July of 2011. The question isn't how many taser cases existed in July 2011. The question is how many cases existed in July 2011 that specifically spoke to when intermediate use of force can be used. And there are several. Bryan, Smith v. City of Hammett, Headwaters v. County of Humboldt, which was a peaceful protest case where the protesters were pepper sprayed. That was 2002. And of course, we have the Graham elements that have been on the books since 1989. And so if we consider all that together, there was sufficient case law in July 2011 that says that if a person is not aggressive, if a person is not attempting to flee, if a person is not a threat to immediate, immediate threat to anybody, and if the person, you know, isn't a felon, it's just a misdemeanor, then those circumstances do not warrant intermediate use of force. And so then the next question is, well, what is intermediate use of force? Was there a case law in July of 2011 that says that, that conclusively showed that tasing someone in dart mode is intermediate use of force? And the answer, again, is yes. The Bryan v. McPherson case was entirely on point. So thanks, counsel. Thank you. Thanks. Emmett v. City of Tacoma shall be submitted again. We thank both counsel for their excellent arguments. It's hard to follow those first guys. But you did a fine job, both of you. And we appreciate it. Stacy? Well, I think I said earlier, Calvert. Well, Emmett is submitted. I think I said earlier that Calvert was being submitted. I think that means our day is done and we can adjourn until tomorrow. Thank you.
judges: Hawkins, Gould, Paez